Scott M. Lowry (CA Bar No. 244504)
scott@lawlb.com
LOWRY BLIXSETH LLP
23632 Calabasas Road, Suite 201
Calabasas, California 91302
Telephone: 818-584-6460
Facsimile: 818-574-6026

Chris Kao (CA Bar No. 227086)
ckao@kaollp.com
Andrew Hamill (CA Bar No. 251156)
ahamill@kaollp.com
Whitney Miner (CA Bar No. 290825)
wminer@kaollp.com
KAO LLP
One Post Street, Suite 1000
San Francisco, California 94104
Telephone: 415-539-0996
Facsimile: 866-267-0243

Attorneys for Plaintiff and Counter-Defendant
Govino, LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| GOVINO, LLC, a Delaware limited liability company,<br><br>        Plaintiff,<br>v.<br><br>GOVERRE, INC., a Delaware corporation; REGAN KELAHER, an individual; SHANNON ZAPPALA, an individual; and DOES 1-10,<br><br>        Defendants.<br>_____<br><br>GOVERRE, INC., a Delaware corporation, REGAN KELAHER, an individual; SHANNON ZAPPALA, an individual; and DOES 1-10, | CASE NO. 8:17-CV-1237 JLS (JCGX)<br><br>**PLAINTIFF GOVINO, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO GOVERRE, INC.'S PARTIAL MOTION FOR SUMMARY JUDGMENT**<br><br>**[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]**<br><br>Date:  September 7, 2018<br>Time: 2:30 p.m.<br>Place: Courtroom 10A<br>Judge: Hon. Josephine L. Staton |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

            Counter-Plaintiffs,

    v.

GOVINO, LLC, a Delaware limited liability
company,

            Counter-Defendant

PLAINTIFF GOVINO, LLC'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................1

II.    SUMMARY OF FACTS ..........................................................2

  A.    Govino's Famousness And Brand Recognition...........................2

    1.    Recognized By Experts In Industry ....................................2

    2.    Industrial Design Awards .................................................3

    3.    Immortalized In History As An Innovator In Housewares ....................3

    4.    Popularized Through Media. .............................................3

    5.    Popularized In Music and Wine/Food Festivals -The Quintessential "Go Anywhere" Setting. ....................................................4

    6.    Success in Marketplace .....................................................4

    7.    Exposure From Co-Branding With Other International Famous Brands. ..4

    8.    Extensive Intellectual Property ...........................................5

  B.    Defendants' Willful Infringement ..........................................5

    1.    Hiring of Govino's Business Director and Marketing/Brand Manager .....5

    2.    Intimately Familiar With Govino..........................................6

    3.    Knowingly Selecting Selecting Confusingly Similar Name "Goverre".....6

    4.    Goverre's Tagline Was Derived From Govino. .........................7

    5.    Govino Was The Mantra Behind Goverre's Development......................8

    6.    Goverre Reverse-Engineered The Govino Design To Copy Govino's Shape And Proportions.....................................................9

  C.    Goverre Intended To Be Associated With Govino ...................9

  D.    Greer and Zappala's Fraudulent Concealment Of Facts From Govino. ....10

III.   STATEMENT OF LAW ........................................................13

IV.    ARGUMENT ....................................................................14

  A.    There Are Material Issues Of Fact Relating To Goverre's Laches Defense ........................................................................14

1.    Fails To Establish Even An Initial Burden.................................14

2.    There Is A Presumption Against Laches Because Govino Brought Suit Within The Four-Year Statute Of Limitations .................................14

3.    Applying Laches Would Not Be Equitable Because Any Delay By Govino In Bringing Suit Was Due To John Greer's Intentional Misrepresentations .................................................................15

**B.    The Facts Are Sufficient For The Jury To Find Willful Infringement .16**

1.    Goverre's Founders Knowingly Used Govino When Selecting The Name "Goverre," Formulating Goverre's Business Plan, And Designing The Product 16

2.    The Gonzalez Email Does Not Even Purport To Be An "Opinion" And Is Nevertheless Insufficient To Defeat Willfulness. ...........................16

3.    The USPTO Prosecution History Is Irrelevant .....................................17

4.    The Richard Opinion Does Not Defeat Willfulness ...............................18

**C.    There Are Sufficient Facts In The Record Support A Finding Of An "Exceptional" Case. ........................................................................20**

**D.    The Facts Support An Award of Actual Damages And Disgorgement of Profits..........................................................................................20**

1.    Govino's May Recover Goverre's Profits As A Proxy Of Its Own Actual Damages. ....................................................................................20

2.    Govino Is Entitled To Disgorgement Of Profits If It Establishes Willfulness.....................................................................................22

**E.    A Reasonable Jury Could Conclude That Govino's Trademark And Trade Dress Are Famous ..........................................................22**

1.    Goverre Incorrectly Relies On *Coach Services* .....................................23

**F.    Kelaher And Zappala Can Be Held Liable For "Authorizing" And "Directing" Goverre's Activities ................................................24**

**V.    CONCLUSION...............................................................................25**

PLAINTIFF GOVINO, LLC'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**CASES**

*adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1048 (D. Or. 2008)......................................................................................................17

*Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car, Co.*, 238 F.3d 378 (5ᵗʰ Cir. 2001).....................................................................................................23

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) ...............................................................................................18

*Blau v. YMI Jeanswear, Inc.*, 2004 WL 5313967, at *5 (C.D. Cal. Jan. 2, 2014) ...21

*Blue Man Productions v. Tarmann*, 75 U.S.PQ.2d 1811 (T.T.A.B. 2005)..............23

*Carter Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 801–02 (9th Cir.1970) ........................................................................................................18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)..................................................14

*Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117, 1121 (E.D. Cal. 2002)....16, 17, 19, 20

*Coach Services v. Triumph Learning LLC*, 668 F.3d 1356 (Fed. Cir. 2012) ...........23

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999)..............................................................................................................24

*Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed. Cir. 1998)........................................................................................................16, 19

*DC Comics v. Towle*, 802 F.3d 1012, 1026, 43 ........................................................16

*Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003)..20

*E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983) .......................15

*Hasbro, Inc. v. Clue Computing, Inc.* 66F.Supp.2d 117 (D. Mass. 1999)...............23

*Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1042 (9th Cir. 2003)............20

*Idaho Golf Partners, Inc. v. Timberstone Management LLC* (D. Idaho 2017) ........24

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002)..15

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) ....................21

*Maier Brewing Co. v. Fleishmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968)........................................................................................................21

*Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 703 F.2d 671 ((W.D. Ky. 2010) .....................................................................................................24

*Media L. Rep.* (BNA) 2368, 116 U.S.P.Q.2d 1068 (9th Cir. 2015) .........................16

*Paramount Farms Int'l LLC v. Keenan Farms Inc.*, 2012 WL 12892420, at *2 (C.D. Cal. 2012)...................................................................................................21

*Pinkette Clothing, Inc. v. Cosmetic Warriors Limited*, 894 F.3d 1015, 1025 (9th Cir. 2018)..............................................................................................................15

*Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir. 1982)..............................................................................................................20

*QS Wholesale, Inc. v. Rox Volleyball, Inc.*, Case No. 13-0512-AG(JPRx), 2014 WL 12567147 at *10 (C.D. Cal. Dec. 31, 2014) ...................................................23, 24

*Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *7 (N.D. Cal. July 14, 2011) .....21

*Rockwell Int'l Corp. v. U.S.*, 147 F.3d 1358, 1366 (Fed. Cir. 1998)........................14

*Shouse v. Pierce County*, 559 F.2d 1142, 1147 (9th Cir. 1977) ...............................15

*Spin Master, Ltd. V. Zobmondo Entertainment, LLC*, 944 F.Supp.2d 830, 839 (C.D. Cal. 2012)................................................................................................20, 21

*Thane Intern., Inc. v. Trek Bicycle Corp.* 204 F.3d 894,911-912 (9th Cir. 2002) .....23

*The Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996)..............................................................................................................25

*Townsley v. Micro Hydroponics, Inc.*, 2008 WL11336799, at *3 (C.D. Cal. Dec. 11, 2008)..............................................................................................................25

*Trovan, Ltd. v. Pfizer, Inc.*, 2000 WL 709149, at *26 (C.D. Cal. 2000) .................17

*Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007)..............................24

**RULES**

Fed. R. Civ. P. 56(c) ......................................................................................14

**CODE SECTIONS**

15 U.S.C. § 1125(c)(2) ............................................................................23, 24

PLAINTIFF GOVINO, LLC'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

Joseph Perrulli ("Perrulli") founded Plaintiff Govino, LLC ("Govino") over ten years ago.  One of Perrulli's closest friends of more than thirty years, John Greer and his company LJG Partners (LJG), served as an advisor throughout.  Greer was also Defendant Shannon Zappala's brother-in-law.

Zappala and Defendant Regan Kelaher ("Kelaher") would eventually hire Greer and LJG to help them develop a company to compete with Govino.  Worst of all, they even gave it the confusingly similar name "Goverre".  Greer and LJG secretly helped Defendants even though they were under contract with Govino to manage Govino's web marketing and branding.  Zappala and Kelaher created and developed Goverre off the goodwill and trials and tribulations of Govino.  Indeed before Zappala and Kelaher began the design of their Goverre glass by hiring the reverse-engineering of Govino's glasses to determine the "Govino proportions".  Govino's glass was the only glass they reverse engineered. Govino was the recurring mantra throughout Goverre's "inventor's notebooks", board meeting minutes, naming and brainstorming records, and internal communications.  As their professional and personal lives continued to intersect with Perrulli and Govino, Greer and Zappala actively mislead Govino and suppressed key facts.

Defendants do not seek summary judgment of no trademark infringement.  Instead Defendants "notice" an attempt to dispose of the entire case based upon their defense of laches, but provide no supporting facts or argument whatsoever to carry their initial burden. Regardless, not only is Govino entitled to a presumption because it brought its action within four years, but Greer's and Defendants' fraud, misrepresentations, suppression of facts, and willful infringement eviscerate any laches defense.

In the same vein, Defendants' attempt at partial summary adjudication against willful infringement, exceptional case, and unjust enrichment fail.  "GOVERRE" was derived from "GOVINO".  Defendants so-called seeking of "legal opinions" after-the-fact cannot defeat willful infringement on summary judgment.

Defendants' attempt to preclude damages are also based upon conclusory and misguided argument.  Rather because Govino and Goverre are direct competitors, Goverre's profits may serve as a proxy for what Govino would have recovered had Goverre not infringed upon or been likely to dilute Govino's mark.

Defendants' challenge to dilution based upon famousness relies upon case law this District has distinguished as being decided before the Trademark Dilution Revision Act of 2006 and not based upon the "light most favorable to non-moving party" standard on summary judgment.  Additionally, Defendants mistaken conditions sufficient to render a mark famous, with conditions necessary to render a mark famous.

Defendants' attempt to dismiss individuals Zappala and Kelaher in their individual capacities also fails.  Because Zappala and Kelaher directed all relevant acts of infringement, they can be sued in their individual capacities.

## II.   SUMMARY OF FACTS

### A.   Govino's Famousness And Brand Recognition

Perrulli founded By The Glass, LLC in 2007 which later became Govino, LLC in January 2014.  SOUF ¶ 100.  Govino designs, manufactures, distributes and sells a niche group of drinking vessels.  SOUF ¶ 101.  Through years of marketing and developing goodwill, Govino has since become a leading global provider of original and distinctive drinking glasses that include, inter alia, its GOVINO® Go Anywhere® shatterproof, reusable, recyclable™ and dishwasher-safe stemless wine glasses, flutes, cocktail glasses, beer glasses, and decanters (collectively the "GOVINO® Products").  *Id.*  Each of the GOVINO® Products are readily identifiable and distinguishable over competitor products, e.g., by way of inclusion of a distinctive ornamental notched indent in the glass sidewall.  SOUF ¶ 102.

#### 1.   Recognized By Experts In Industry

The GOVINO® Products are recognized by experts in the wine industry, such as Nicola Marzovilla (wine distribution company, restaurant and vineyard owner) and Seth Box (director

of education for Moët Hennessy USA), both of whom recommended the GOVINO® Go Anywhere® Wine Glass in The New York Times.  SOUF ¶ 103.

### 2.  Industrial Design Awards

Govino has earned numerous awards related to the distinctive product configuration and/or trade dress for several of its products. Specifically, the GOVINO® Go Anywhere® Wine Glass won the International Design Excellence Award (IDEA) –Silver Award (2010) and the Good Design Award for 2010 from the Chicago Athenaeum: Museum of Architecture and Design ("Good Design Award"); and the GOVINO® Go Anywhere® Flute  won the IDEA – Bronze Award (2012) and the Good Design Award for 2012.  SOUF ¶ 104.  The IDEA awards are from the Industrial Designers Society of America, and Govino was the recipient of these awards based on the premise that the GOVINO® Go Anywhere® Wine Glass and the GOVINO® Go Anywhere® Flute made drinking wine out of plastic glass acceptable in the wine industry. SOUF ¶ 105.  In 2016 the GOVINO® "Go Anywhere Dishwasher Safe Series" again won the Good Design Award  SOUF ¶ 106.  That same year Govino's jewel-toned glasses won the Pantone Award from the Pantone Institute.  SOUF ¶ 107.

### 3.  Immortalized In History As An Innovator In Housewares

Govino's impact on the history of housewares has been immortalized with the awarding of a free-standing refrigerator-sized plaque at the International Housewares Association ("IHA") headquarters that has been and will be displayed at every IHA show since 2016.  SOUF ¶ 108.  Govino's role in the history of wine was documented with the display of the iconic GOVINO® Go Anywhere® Wine Glass and its GOVINO® 4-Pack Tote being featured at the seminal Design Exhibition "How Wine Became Modern" at the San Francisco Museum of Modern Art in 2010.  SOUF ¶ 109.

### 4.  Popularized Through Media.

The GOVINO® Go Anywhere® Wine Glass, along with other GOVINO® Products, have been displayed and endorsed through video publications, such as by television personality and well-known celebrity Martha Stewart (marthastewartliving.com) and The

3

Today Show. SOUF ¶ 110.  The GOVINO® Products include product placements in numerous popular TV shows such as The Bachelor®, the George Lopez show, The Martha Stewart Show, The Today Show, The Bachelor, HouseWives of Beverly Hills, Bad Mom's, Oscar® winning movies such as La La Land, and **hundreds** of world-renowned newspapers , magazines and respected online articles that reach millions of readers daily.  SOUF ¶¶ 111-112.  In 2017 alone, Govino achieved over of 24 Million print impressions, and over 842 Million web impressions. SOUF ¶ 113.

### 5.     Popularized In Music and Wine/Food Festivals -The Quintessential "Go Anywhere" Setting.

Additionally, Govino has been featured at the most internationally known food, wine and music festivals, such as Coachella, Bottlerock, Outside Lands, Aspen Food & Wine, Pebble Beach Food & Wine, and the Robert Mondavi Discover Wine Tour to name a few. These festivals are particular to the "Go Anywhere" drinking of beverages.  There is no more relevant venue where more people would be exposed to Govino at the same time, same place. SOUF ¶¶ 114-115.

### 6.     Success in Marketplace

The GOVINO® Products are now among the most sought after and well-recognized products in the industry.  SOUF ¶ 116.  For example, the GOVINO® Products have been top selling products on Amazon.com, some of which have been highly ranked (i.e., #1-#4) for several years dating back to 2010.  *Id.*  Thus, the GOVINO® Products rank in the top 1% of products on Amazon.com.  In each instance, the Amazon.com listings prominently display Govino's trademarks, distinctive product configurations, and distinctive trade dress.  *Id.*

### 7.     Exposure From Co-Branding With Other International Famous Brands.

Govino enjoys additional exposure through co-branding with other non-wine, famous brands including Amercian Express, Lexus, Audi, Maserati, Citibank, Madison Square Garden, Martha Stewart, America's Cup, Kentucky Derby, Shake Shack, etc.; and partnerships with hundreds of flagship wineries including Robert Mondavi, Rombauer, Duckhorn, Frogs Leap, Francis Ford Coppola.  SOUF ¶¶ 117-118.

4

### 8.  Extensive Intellectual Property.

Govino is also the sole and exclusive owner of several valid and enforceable United States trademark registrations for GOVINO and GO ANYWHERE for "Decanters; Drinking vessels" and "wine, wine sold in a flexible pouch, wine sold in a flexible pouch with a disposable wine glass, and wine sold in a single serving size". SOUF ¶¶ 119-121. Govino's success has resulted in the copying its intellectual property and attempt take a free ride upon its goodwill. Govino has acted to police and enforce such intellectual property violations by sending over a hundred takedown notices and cease and desist letters to various infringing entities and filing numerous lawsuits. SOUF ¶ 122. Govino's legal action has been largely successful. *Id.*

### B.  Defendants' Willful Infringement.

#### 1.  Hiring of Govino's Business Director and Marketing/Brand Manager.

Greer, along with LJG, acted as business advisor for Govino and Govino's predecessor entities beginning in 2007, contracted to re-design Govino's website and refresh its logo between February 2014 through April 2015, and was poised to be Govino's marketing and brand manager. SOUF ¶ 123. Additionally, Perrulli considered Greer one of his closest friends for over 30 years. SOUF ¶ 124. Greer, served as Perrulli's and Govino's advisor since founding. *Id.* In 2010 Greer brought Zappala to visit Perrulli and Govino as documented. SOUF ¶ 125.

███████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ Not so coincidentally, after John Greer and his then fiancé, now wife Beth O'Hara (now Beth Greer) attended as early as February 4, 2013 beginning at least as early as February 4, 2013, ████████████████████████████ ██████████████████████████ John Greer and Beth O'Hara were indeed "mentors" throughout. *Id.* Kelaher and Zappala also engaged the services of John Greer's company LJG Partners ("LJG") including LJG's Marketing Director, Amanda Whichard

Holliday, and Account Executive, Jessica Gourvitz who were had provided and were providing PR, marketing, and brand management services to Govino.  SOUF ¶ 128

### 2.    Intimately Familiar With Govino.

Prior to deciding to start a company, Zappala, Kelaher, and Greer were intimately familiar with Govino.  SOUF ¶ 129.  For example, the Goverre founder Shelby Novelle admits the extent of their active use of Govino "instead of regular wine glasses" mostly "whenever there was, like, you know, activity going on when there was people over, and we were all visiting and didn't want any broken glasses." *Id.*

### 3.    Knowingly Selecting Selecting Confusingly Similar Name "Goverre".

Zappala and Kelaher had direct knowledge of Govino.  It's selection of Goverre was no coincidence.

 

Below are just some of the many similarities between GOVINO and GOVERRE that linguistics expert Dr. Butters identified:

- They begin with the same three phonemes, [gov-].

- The word go.  *go + vino* and *go + verre*, so that the most-significant initial portion of each is again exactly the same—that is, the familiar word *go* followed by a non-native word that begins with the letter <V> and the sound [v].

- They are short words, composed of nearly the same number of PHONEMES (6 versus 5).

- They begin with an unstressed syllable and are stressed on the second syllable.

- They have identical consonant-vowel (CV) structures consisting of alternating single consonants followed by vowels.

- What is true of the phonology of GOVINO and GOVERRE is also true of SPELLING: the marks are of moderate and nearly equal length, beginning with the same three-letter sequence,  <GOV->, which makes up approximately half of each word (50% and 42.9% respectively)

- Furthermore, words ending in <-O> and <-ERRE> are relatively rare in English, thus marking each word as unusual and generally borrowed from Romance languages (Latin, French, Italian, Spanish).  The fact that the "look" of each word is in this way

peculiar or exceptional for both words cancels out the abnormality factor as a feature that might otherwise distinguish one mark from the other.

SOUF ¶ 130.

Greer admits he thought Goverre and Govino sounded alike. SOUF ¶ 131. ("…, but I just think they kind of sound similar. Go V, you know.") *Id.*  Goverre co-founder Shelby Novelle also confirmed that they were similar. SOUF ¶ 127 ("…G-O-V. I mean, the rest it's different. Could someone get confused, maybe...") *Id.*

### 4.   Goverre's Tagline Was Derived From Govino.

Govino's tagline is GoAnywhere®.  Goverre, whose name is also similar to GoAnywhere® devised the tagline Any Wine Any Time.

PLAINTIFF GOVINO, LLC'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT



1
2
3
4
5
6
7

**5.      Govino Was The Mantra Behind Goverre's Development**

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---
[1] Provided to govino by Greer.  Zappala Tr. 120:22-121:13.

**6.      Goverre Reverse-Engineered The Govino Design To Copy Govino's Shape And Proportions.**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█ ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

*Id.*

████████████████████████████████████████████████

████████████████████████████████

**C.      Goverre Intended To Be Associated With Govino**

In addition to choosing a confusingly similar name, Defendants intended the association of Goverre with Govino.  Greer tied the success of Goverre to Govino.  For example, in an email of January 2014 updating Zappala and Kelaher about positive developments for Govino, namely being purchased by Ladera Vineyards, Greer closed with "Here's to GOVERRE and govino!"   SOUF ¶ 139. In another email discussing Govino's acquisition, Greer says "I see this as a good sign for GOVERRE!...So excited for you both. Please let me know if Amanda

may be of assistance." SOUF ¶ 141. "Amanda" refers to Amanda Whichard of LJG, who

serviced the Govino account. *Id.*

████████████████████████████████████████████████████

████████████████ This was presumably another reason why they chose the similar-

sounding name Goverre and to mimic Govino's glass.

Indeed, throughout its business plans and presentations, ████████████████

████████████████████████████████████████████████████████

████████████████████████████

Goverre also knew that others approached Goverre following an association with

Govino. SOUF ¶ 144. In one example, April Yap Hennig, a marketer from Sacreddrop.com

offered to promote Goverre while mentioning she had "been using GoVino glasses for the

beach". *Id.* No other product was mentioned. SOUF ¶ 145. In another example, Monti

Porter, a sales representative from Scarlet&Co messaged Goverre with "Hi- We love your

Goverre! We currently represent Govino in the Pacific NW and would love to also represent

Goverre when you are ready to work with sales representation..." SOUF ¶ 146. Again, no

other company name was mentioned. SOUF ¶ 147.

**D.    Greer and Zappala's Fraudulent Concealment Of Facts From Govino.**

Greer's assistance to Zappala and Kelaher in violation of his fiduciary duties to Govino

was secretive. Greer passed Zappala and Kelaher Govino's confidential financial and pricing

information, and business strategies. SOUF ¶ 147.

Meanwhile, Zappala similarly misled Govino. While Zappala would "Like" Govino on

Facebook on April 7, 2013, she hid the fact that t████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

In January 2014, Govino discovered that Greer had supported a company called Goverre

founded by Zappala on Facebook. SOUF ¶ 150. Following some discussion, Greer lead

Govino to believe that he would fix the problem. SOUF ¶ 151. Greer, after all, was engaged

to Zappala's sister, Beth O'Hara (now Beth Greer), and would soon be contracted by Govino

10

for its marketing and brand management.  SOUF ¶ 123.  Greer represented that Kelaher and Zappala were trying to raise money to start a company on Kickstarter, and that if they couldn't meet their funding goal, the project would be "put on hold indefinitely."  Greer further downplayed the threat by portraying Zappala and Kelaher as amateur moms that were in over their heads, and reaffirming his allegiance to Govino.  SOUF ¶ 151.

On February 14, 2014, just nine days after LJG had entered a contract with Govino, Perrulli again raised the issue to Greer after a concerned Govino affiliate expressed concern after learning that Goverre was on Kickstarter.  SOUF ¶ 152.  Greer responded that i) the "Kickstarter was a non-starter" having fallen "short by $60k"; ii) the project was "on indefinite hold"; and iii) "honestly, GOVERRE doesn't even have a product."  *Id.*  Greer then informed Perrulli that "If it ever gets off the ground to a point where they are even in limited production, I think a serious legal notice from your attorney would of course be warranted."  *Id.*  Greer closed by reiterating to Govino that "without exception, my heart and focus lies on helping you make Govino successful"; and that "as you know, it's been a personal passion of mine for a great while."  *Id.*  Greer informed Defendants and forwarded his communications with Govino.  SOUF ¶¶ 159-160.

Greer's statement was knowingly false.  What Greer did ***not*** tell Perrulli and Govino was that just days before, on or around January 17, 2014, Greer attended GOVERRE's private launch party.  SOUF ¶ 154.  In that context Greer had just congratulated Kelaher and Zappala, and advised them that the "next 28 days are really 'mission critical' and offered the services of LJG marketing director Amanda Whichard to help with "connecting of micro-campaigns and the execution of these".  SOUF ¶ 155.  ████████████████████████ ████████████████████████████.  Having dissuaded Perrulli and Govino's concerns, the same day, Greer issued a $2,000 check from LJG to Goverre to help Goverre move forward.  SOUF ¶ 157.  Greer immediately continued behind Govino's back and Defendants continued to promote Goverre on social media, and facilitate its promotional events.  *Id.*  While Greer was dissuading Govino and Perrulli from taking action, he was

passing information to Zappala.  SOUF ¶ 158.  As Zappala testified, Greer's statement to Perrulli was false, and Goverre was never on indefinite hold SOUF ¶ 153.

Defendants were privy to Greer's conversations with Perrulli and Govino as Greer was forwarding them to Defendants.  SOUF ¶ 140.  Defendants also authorized, expected, and understood Greer was communicating on their behalf.  *Id.*  Accordingly Greer's actions are imputed to Defendants.  Zappala certainly understood Govino's concern and was on notice, telling Greer " My only concern, at this point in time, is not getting you into the middle of anything"  and "OK! Will I still be allowed up in Govino land?? ;) hehe."  SOUF ¶ 158.

Greer allowed the falsehoods and Govino's detrimental reliance to continue even as Goverre continued to develop into a competitor and threat over the next year and a half. SOUF ¶ 159.  For example, while LJG was retained to develop a new media campaign, refresh its brand and logo, and redesign Govino's website in 2014-2015, Greer kept silent about Goverre every step of the way including: when Goverre initiated a second Kickstarter campaign; when Goverre's second Kickstarter campaign became successful; when Greer continued to help Goverre with its public relations, social media marketing, brand management, and press outreach for upcoming trade shows; and when Goverre began shipping product to its customers.  SOUF ¶ 160.

In April 2014, Zappala would further misleadingly congratulate Joseph on Govino developments but continue to suppress facts about Goverre's development, ███████████ ███████████████████████████████████████████   SOUF ¶ 161.  As far as Perrulli was concerned, Zappala's previous "Goverre" project was a non-starter that was a source of embarrassment to her, and not worth mentioning. SOUF ¶ 162.

As another example, while Perrulli, along with Zappala, attended Greer's intimate wedding in Italy as one of only a few non-family members in May 2016, where Govino supplied specially seventy-two custom-engraved Govino glasses used throughout the entire occasion, Greer and Zappala continued to keep silent.  SOUF ¶ 163.  And as Greer continued to plug Govino and share Govino, including its acquisition by new ownership, Perrulli's new role as Govino's Creative Director, and the release of Govino's new beer glass product, Greer

12

and Zappala kept silent about the fact that Goverre had applied to be on the ABC show Shark Tank, and that Greer was helping Goverre prepare for that appearance.  SOUF ¶ 164.  Even when Perrulli's girlfriend Rebecca Thompson, introduced herself to Zappala as working in wine distribution, sales and marketing for Maisons & Domaines Henriot, and being a veteran in the wine industry for 20 years, Zappala only told a half-truth about being a "stay-at-home" mom, who used to be in marketing.  SOUF ¶ 165.  Neither Zappala, nor Greer brought up how Zappala had started a wine glass company called Goverre, that might be appearing on Shark Tank despite the natural segues.  SOUF ¶ 166.  Indeed there were plenty of opportunities to do so during the wedding ceremonies, dinner, kitchen cooking together, poolside, happy hour, breakfasts, when they spent 3-4 days at the villa.  *Id.*  Zappala and Greer's suppression of facts continued on to other friendly meetings including 4th of July gatherings with Perrulli and Thompson and a holiday party.  SOUF ¶ 167.

Only after Goverre aired on Shark Tank in April of 2017 and closed a deal publicly did Govino find out that Goverre was not been abandoned after its first Kickstarter campaign failed.  SOUF ¶ 168.  Govino immediately sent cease & desist letters to Goverre in May.  *Id.*  Weeks after the episode aired, Govino began to learn of and experience consumer confusion between Govino and Goverre.  SOUF ¶ 174.  Greer's deception and falsehood denied Govino the opportunity to seek multiple legal options, prejudiced Govino's rights, and limited Govino's only remedy to filing an expensive lawsuit against Goverre and its founders which it did three years after its first Kickstarter campaign in July of 2017.  *Id.*

## III.   STATEMENT OF LAW

Summary judgment is only appropriate where the pleadings and papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the moving party, Goverre bears the burden of demonstrating the absence of a genuine issue of material fact. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In deciding Goverre's Motion for Partial Summary Adjuication, the Court must view the evidence in the light most favorable to Govino, and all doubts and

reasonable inferences must be drawn in Govino's favor.  *See*, e.g., *Rockwell Int'l Corp. v. U.S.,* 147 F.3d 1358, 1366 (Fed. Cir. 1998).

## IV.  ARGUMENT

### A.  There Are Material Issues Of Fact Relating To Goverre's Laches Defense.

#### 1.  Fails To Establish Even An Initial Burden.

"Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party bears the burden of producing evidence to support its claim only after the moving party has met its burden. *Id.* at 324.  Although Goverre noticed summary adjudication on laches, it did not attempt to meet its initial burden.  As such, the court should deny summary adjudication on laches.

#### 2.  There Is A Presumption Against Laches Because Govino Brought Suit Within The Four-Year Statute Of Limitations.

Regardless of Defendants' evidentiary failures, Govino is entitled to a presumption against laches.  Ninth Circuit courts have consistently held that if a plaintiff brings a trademark lawsuit within four years of the time it knew or should have known of the infringement, there is a strong presumption that laches cannot apply.  *Pinkette Clothing, Inc. v. Cosmetic Warriors Limited*, 894 F.3d 1015, 1025 (9th Cir. 2018) ("The most analogous state statute of limitations…is California's four-year statute of limitations for trademark infringement actions."); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) citing *Shouse v. Pierce County*, 559 F.2d 1142, 1147 (9th Cir. 1977) ("[A] laches determination is made with reference to the limitations period for the analogous action at law. If the plaintiff filed suit within the analogous limitations period, the strong presumption is that

laches is inapplicable.").  Here, it is undisputed that Goverre did not ship a single glass until March 30, 2015.  SOUF ¶ 169.  Thus, there is a strong presumption against laches.

> ### 3.    Applying Laches Would Not Be Equitable Because Any Delay By Govino In Bringing Suit Was Due To John Greer's Intentional Misrepresentations.

After determining whether a presumption against laches applies, Courts then assess the equity of applying laches using the *E-Systems* factors: (1) "strength and value of trademark rights asserted;" (2) "plaintiff's diligence in enforcing mark;" (3) "harm to senior user if relief denied;" (4) "good faith ignorance by junior user;" (5) "competition between senior and junior users;" and (6) "extent of harm suffered by junior user because of senior user's delay." *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).

In addition to Govino's presumption against laches, each of the *E-Systems* factor favors Govino: (1) Govino's trademark rights are strong, as evidenced by significant recognition and publicity.  SOUF ¶ 172.  (2) Govino diligently filed suit after discovering that Goverre was on the market in April, 2017.  SOUF ¶ 173.  (3) The many inquiries to Govino sales representatives about Goverre evidence customer confusion and diversion of sales if relief is denied.  SOUF ¶ 174. (4) As discussed in Section II.B, supra, any delay was attributable to good-faith ignorance of Goverre's activities due to John Greer's fraudulent statements made on behalf of Goverre.  SOUF ¶ 175.  (5) Govino and Goverre compete for customers looking for stemless on-the-go wine glasses.  SOUF ¶ 176.  (6) Goverre was shipping product for only two years when Govino brought suit.  SOUF ¶ 177.  The harm to Goverre is insufficient to justify nullifying Govino's trademark rights.  Govino should be allowed to present this evidence at trial.

Further, a laches defense does not apply if there is willful trademark infringement; defendant's knowing use of plaintiff's marks in order to exploit their value barred defendant from asserting a laches defense.  *DC Comics v. Towle,* 802 F.3d 1012, 1026, 43; *Media L. Rep.* (BNA) 2368, 116 U.S.P.Q.2d 1068 (9th Cir. 2015).  As discussed below, Goverre knowingly infringed Govino's trademarks to exploit their value.

**B.    The Facts Are Sufficient For The Jury To Find Willful Infringement.**

    **1.    Goverre's Founders Knowingly Used Govino When Selecting The Name "Goverre," Formulating Goverre's Business Plan, And Designing The Product.**

As discussed above in great detail, Govino was front-and-center in Goverre's naming, formation and development.  Defendants deliberately recruited Govino's contracted brand manager, selected a confusingly similar name, cribbed Govino's tag-lines, reverse-engineered Govino's glass, followed Govino's business plans, and capitalized on mistaken associations. And when Perrulli raised concerns of confusion, Goverre's further suppression confirm knowledge and willfullness.  These undisputed facts are sufficient to defeat summary judgment.

    **2.    The Gonzalez Email Does Not Even Purport To Be An "Opinion" And Is Nevertheless Insufficient To Defeat Willfulness.**

Obtaining the advice of counsel only negates willfulness if the advice is competent and the defendant follows counsel's advice.  *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117, 1121 (E.D. Cal. 2002) (citing *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed. Cir. 1998)).  "Whether advice is competent, and whether it was reasonable to rely on the advice, depends on several factors, including: (1) the background research performed by the attorney; (2) whether the opinions were written or oral; (3) the objectivity of the opinions; (4) whether the attorneys rendering the opinions were trademark lawyers; (5) whether the opinions were detailed or merely conclusory; and (6) whether material information was withheld from the attorney."  *adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1048 (D. Or. 2008) (citing *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117, 1121 (E.D. Cal. 2002)).  Goverre was not reasonable in relying on Mr. Gonzalez's email for several reasons.

Presumably Mr. Gonzalez meant that Goverre, the junior user, could change its name to avoid infringement.  Goverre did not heed Mr. Gonzalez's warning.

Second, even Mr. Gonzalez's email is interpreted as an opinion of non-infringement, it is too scant to negate willfulness.  It is a single sentence in an email that also discussed other topics, it lacks any detail, and it cites no relevant legal authority.  Such a meager, off-the-cuff statement is not "thorough enough to instill a good faith belief that defendant's use of the trademark would not infringe plaintiff's rights."  *Trovan, Ltd. v. Pfizer, Inc.*, 2000 WL 709149, at *26 (C.D. Cal. 2000); *see also*, *Chiron Corp.*, 268 F.Supp.2d at 1122 ("The fifty-six page letter is thorough, detailed, cites the relevant case law, and was drafted by patent attorneys. All of these facts support a finding that the opinion letter was both competent and reliable.").

Third, Mr. Gonzalez is not a trademark lawyer.  According to his firm bio page, Mr. Gonzalez oversees the firm's "Environment & Land Use, Government Relations, and Election Law practice area groups" and also "assists with matters under the Real Estate, Action Sports, Business, and Litigation practice groups."  SOUF ¶ 178.  ███████████████

████████████████████████████████████   ██████████████

████████████████████████████████████████████

████████████████████████████████

### 3.   The USPTO Prosecution History Is Irrelevant.

Defendants' arguments about the prosecution history are irrelevant.  Goverre knew Govino considered GOVERRE to be infringing in January 2014, and acted instead to deceive Govino.

Further, Defendants improperly speculate that because the Trademark Examiner's search reports "reveals that she viewed certain records, she must have concluded that there was no conflicting applications or…she would have cited either of those prior filed applications as a potential bar."  SOUF ¶ 180.  Not so.  An actual replication of each of the Trademark Examiner's searches for potentially conflicting marks, and a review of each of those marks, reveals that the Trademark Examiners did not consider Govino's registered "GOVINO" mark when evaluating GoVerre's trademark application for "GOVERRE", and

17

did not consider GoVerre's registered mark "ANY WINE.  ANY TIME" when evaluating
Govino's application for "GO ANYWHERE."  SOUF ¶¶ 180-181.  Regardless, the finding of
a trademark examining attorney "must be regarded as inconclusive since [it is] made at [the]
lowest administrative level."  *Carter Wallace, Inc. v. Procter & Gamble Co*., 434 F.2d 794,
801–02 (9th Cir.1970). "The ultimate determination by the PTO "is rendered less persuasive
still by the fact that the [PTO] did not have before it the great mass of evidence which the
parties [subsequently present]")."  *Id*.  Indeed, standards for evaluating likelihood of confusion
in the USPTO's examination process is more much limited than litigation since Trademark
Examiners are limited to evaluating the potentially conflicting trademarks *as filed* for the
goods and services *as described* in the pending applications and Trademark Examiners search
results are often flawed, as they were during the examinations of Govino and GoVerre's
applications.  SOUF ¶ 181.

### 4.       The Richard Opinion Does Not Defeat Willfulness.

Ms. Richard's non-infringement opinion is too little too late to justify summary
judgment of no willfulness.  In *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876
F.3d 1350, 1371 (Fed. Cir. 2017), the Court affirmed a finding of willfulness where the
defendant performed only a cursory analysis of the plaintiff's patents upon discovering them
and waited years before seeking the advice of qualified counsel.  *Ibid.*  Similarly, in *Chiron
Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117 (E.D. Cal. 2002), the defendant only sought an
opinion of counsel after it had decided to move forward without engaging in licensing
discussions.  The Court held that a "jury could infer" that the defendant had "sought the
outside opinion only to insulate itself from enhanced damages for willful infringement rather
than for advice upon which it could rely in making its business decisions."  *Id*. at 1125.

Here Goverre knew that Govino believed Goverre infringed Govino's trademark in
January 2014 and received at most an off-the-cuff response from Mr. Gonzalez at that time.
Over three years later, after Govino discovered that Goverre was on the market and sent a
cease-and-desist letter, did Goverre finally seek the advice of qualified counsel.  As in *Arctic
Cat Inc.* and *Chiron Corp.*, a jury could reasonably decide that Goverre sought Ms. Richard's

opinion letter not to seek advice upon which it could rely in making a business decision but rather only to insulate itself from enhanced damages for willful infringement.

In addition to waiver, Goverre is not entitled to summary judgment of no willfulness based on Ms. Richard's opinion letter because Goverre withheld relevant information about its future products from Ms. Richard. Courts have emphatically held that a defendant cannot rely on an opinion letter if it has withheld material information from its legal counsel:

> In order to provide a prophylactic defense to a charge of willful infringement, 'counsel's opinion must be premised upon the best information known to the defendant. Otherwise, the opinion is likely to be inaccurate *and* will be ineffective to indicate a defendant's good faith intent. ***Whenever*** material information is **intentionally withheld**, or the best information is intentionally not made available to counsel during the preparation of the opinion, **the opinion can no longer serve its prophylactic purpose of negating a finding of willful infringement**

*Chiron Corp. v. Genentech, Inc.*, 268 F.Supp.2d 1117, 1123  (E.D. Cal. 2002) (quoting *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed. Cir. 1998) (emphasis in original)).

██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ █████████████████████████ ████████████████████████████████████ Even though likelihood of product line expansion is one of the Sleekcraft factors and clearly relevant to Ms. Richard's analysis, Goverre deliberately withheld this information. ████████████████████████████████ ████████████████████████████████████████████

A jury could infer that Defendants because Defendants withheld important and potentially damaging information from Ms. Richard, they "sought the opinion in bad faith, and did not actually rely on *any* aspect of the opinion letter." *Chiron Corp.*, 268 F.Supp.2d at 1125.

**C.     There Are Sufficient Facts In The Record Support A Finding Of An "Exceptional" Case.**

Willful infringement is sufficient grounds for a finding that a case is exceptional and an award of attorneys' fees. *See e.g.*, *Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1042 (9th Cir. 2003) ("Exceptional cases include cases in which the infringement is malicious, fraudulent, deliberate, or willful."); *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003) ("A trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully"); *Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir. 1982).  For the reasons discussed in Section II.B, supra, Goverre is not entitled to summary judgment on the issue of willfulness. Thus, summary judgment is also inappropriate on the issue of whether this is an exceptional case.

**D.     The Facts Support An Award of Actual Damages And Disgorgement of Profits.**

Under §1117(a), a plaintiff may recover an infringing defendant's profits in two situations: (1) as a measure of the plaintiff's own damages; or (2) on a theory of disgorgement of the defendant's unjustly obtained profits.  *Spin Master, Ltd. V. Zobmondo Entertainment, LLC*, 944 F.Supp.2d 830, 839 (C.D. Cal. 2012).  The Act "confers a wide scope of discretion upon the district judge in the fashioning of a remedy for a violation of the Act[.]"  *Id.*

**1.     Govino's May Recover Goverre's Profits As A Proxy Of Its Own Actual Damages.**

Courts have recognized that a plaintiff "may use defendant's profits as a proxy for its actual damages" in a case under §1117(a).  *Paramount Farms Int'l LLC v. Keenan Farms Inc.*, 2012 WL 12892420, at *2 (C.D. Cal. 2012) (emphasis added); *Spin Master, Ltd. V. Zobmondo Entertainment, LLC*, 944 F.Supp.2d 830, 839 (C.D. Cal. 2012) (permitting the plaintiff to pursue its "proxy theory of lost profits" which used the defendant's profits as a "yardstick" measure of its actual lost profits.) *Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *7 (N.D.

Cal. July 14, 2011)("Where a plaintiff and defendant are in direct competition and the plaintiff is unable to prove its own lost sales, an award of the defendant's profits may serve as proxy for what the plaintiff would have recovered had the defendant not infringed upon or been likely to dilute the plaintiff's mark.") *citing Maier Brewing Co. v. Fleishmann Distilling Corp.,* 390 F.2d 117, 123 (9th Cir. 1968); *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).

"When the defendant's profits are the measure of the plaintiff's losses, '[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty,' which are presumed to be the result of the infringing activity." *Spin Master*, 944 F.Supp.2d at 839 (citations omitted).  Framed another way, "Plaintiff must establish both that the parties are in direct competition and that Plaintiff suffered actual loss due to Defendants' infringing sales."  *Blau v. YMI Jeanswear, Inc.*, 2004 WL 5313967, at *5 (C.D. Cal. Jan. 2, 2014).  "[T]he plaintiff need not show that the infringement was willful." *Paramount Farms Int'l LLC v. Keenan Farms Inc.*, 2012 WL 12892420, at *2 (C.D. Cal. 2012) (emphasis added).

This "Diversion-of-Sales" theory is "based on the idea that the defendant diverted sales that would have gone to the plaintiff but for the infringement."  *Spin Master*, 944 F.Supp.2d at 840 (citations omitted).

Here, Goverre and Govino market and sell its glasses to the same retailers.  Goverre sells its glasses in "retail stores and on the internet through online retailers and the company's website."  SOUF ¶ 186.  Govino also sells in retail stores and on the Internet through online retailers.  SOUF ¶ 187.  Indeed, Goverre and Goverre glasses are both sold on Wine Enthusiast (online), Touch of Modern (online), QVC (online) and Amazon (online).  *Id.*  Also, both Govino and Goverre target the same customer base.  Both glasses are marketed on Amazon as portable, stemless wine glasses for consumers on the go.  SOUF ¶ 188.  The Govino and Goverre glasses also appear in the same product categories to Amazon consumers.  *Id.*



. Meanwhile, Govino's sales dipped by approximately **$1,195,379** from $7,873,879 to $6,678,500 from 2016 to 2017. *Id.*

### 2. Govino Is Entitled To Disgorgement Of Profits If It Establishes Willfulness.

As discussed in Section II.B, supra, there are important material issues of fact for the jury to determine that Goverre willfully infringed Govino's trademark and trade dress including the Govino mantra that influenced Goverre's development, and Goverre's sneaking around and hiding of facts.

### E. A Reasonable Jury Could Conclude That Govino's Trademark And Trade Dress Are Famous.

There is sufficient undisputed evidence for a jury to conclude that Govino's trademark and trade dress are famous. A mark is "famous" for purposes of dilution if "it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2). In determining whether a

---

[1] The line graph plots the annual gross sales for both Govino (red) and Goverre (blue) for the time period from 2014 to 2017.

22

mark or trade dress possesses the requisite degree of recognition, the court may consider "all relevant factors," including, but not limited to, the following: (i)The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties. (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark. (iii) The extent of actual recognition of the mark and (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

### 1.   Goverre Incorrectly Relies On *Coach Services*

Goverre leans on *Coach Services v. Triumph Learning LLC*, 668 F.3d 1356 (Fed. Cir. 2012), which relies on the reasoning of cases decided **prior to** the enactment of the Trademark Dilution Revision Act in 2006, to argue that Govino is not famous.  This District has questioned the applicability of caselaw that relies on the pre-TDRA standard for fame.  *QS Wholesale, Inc. v. Rox Volleyball, Inc.*, Case No. 13-0512-AG(JPRx), 2014 WL 12567147 at *10 (C.D. Cal. Dec. 31, 2014)  In *QS Wholesale*, Judge Guilford declined to follow *Coach Services* explaining that "[T]he Court is skeptical about the extent of the continued applicability of the reasoning of the cases cited by the *Coach Services, Inc.* court because those cases were decided **before** enactment of the TDRA." (emphasis added).[1]  The *QS Wholesale* Court also distinguished the *Coach Services*' on procedural grounds, namely that *Coach Services*' was reviewing a decision of the Trademark Trial and Appeals Board and thus reviewing factual findings for "substantial evidence."  *QS Wholesale*, 2014 WL 12567147 at *10.  In contrast, on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. [2] *Id.*  Judge Guilford ultimately denied summary

---

[1] Goverre reliance on "non-famous" cases *Blue Man Productions v. Tarmann*, 75 U.S.PQ.2d 1811 (T.T.A.B. 2005); *Thane Intern., Inc. v. Trek Bicycle Corp.* 204 F.3d 894,911-912 (9th Cir. 2002) (Trek Bicycles); *Hasbro, Inc. v. Clue Computing, Inc.* 66F.Supp.2d 117 (D. Mass. 1999); *Hasbro, Inc. v. Clue Computing, Inc.* 66F.Supp.2d 117 (D. Mass. 1999); *Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car, Co.,* 238 F.3d 378 (5th Cir. 2001) should also be distinguished for being decided before the TRDA.

[2] Goverre's non-famous cases *Blue Man Group*, Advantage Rent-A-Car, *Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 703 F.2d 671 ((W.D. Ky. 2010); and *Idaho Golf Partners, Inc. v. Timberstone Management LLC* (D. Idaho 2017) should likewise be distinguished for applying a "sufficient evidence" following findings of fact rather than a "light most favorable" to Govino standard.  Similar to the Judge uilford' recitation of the "substantial evidence" standard for a review of a Trademark Trial and Appeals Board,

judgment holding that a reasonable jury could conclude that the ROXY mark, with $200 million in sales and $20 million in promotional expenditures, was famous.  *QS Wholesale*, 2014 WL 12567147 at *10.  Goverre's cited cases are inapposite for the same reasons.

Defendants argument further confuses sufficient and necessary metrics.  Indeed, govino is advertised and promoted through donations and discounting of millions of glasses, co-branding with international brands, and co-branding with hundreds of wineries that don't translate in a raw advertising budget.  Its prolific history of design awards; extensive publicity through media seen by large numbers of the general public; memorialization and recognition as a game-changer in both the wine and housewares industry; unique exposure at music, wine and film festivals, are unique distinguishing factors that, when viewed in favor of Govino satisfy the requirements of 15 U.S.C. § 1125(c)(2) and overcome Goverre's challenge on summary judgment.

### F.   Kelaher And Zappala Can Be Held Liable For "Authorizing" And "Directing" Goverre's Activities.

Kehaler and Zappala can be held directly liable for trademark infringement that they authorized, directed or participated in, even if they were acting as agents of the corporation and not on their own behalf.  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) ("An officer cannot 'hide behind the corporation where he is an actual participant in the tort."); *The Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) ("[A] corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf"); *Townsley v. Micro Hydroponics, Inc.*, 2008 WL11336799, at *3 (C.D. Cal. Dec. 11, 2008) ("Defendants argue that courts have required officers to be "central figures" in the infringing activity.  However, the court did not base its decision on this reasoning, and instead merely states the basic rule: 'It is clear that [the officer] authorized and approved the acts of unfair competition ... this is sufficient actual participation to make [him] individually liable.'").  ████████████████████

---

"a jury's verdict must be upheld if it is supported by substantial evidence…". See e.g. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

1

2

3

4   The Court should ignore Goverre's "contributory infringement" strawman.  The caselaw

5 makes clear that Kelaher's and Zappala's liability is for direct, not contributory, infringement.

6

**V.   CONCLUSION**

7       Goverre's motion for partial summary adjudication should be denied.

8

9

10

11

12 Dated: August 17, 2018

13              By:  */s/ Chris Kao*

14              Scott M. Lowry (CA Bar No. 244504)
                scott@lawlb.com
15              LOWRY BLIXSETH LLP

16              Chris Kao (CA Bar No. 227086)
                ckao@kaollp.com
17              Andrew Hamill (CA Bar No. 251156)
                ahamill@kaollp.com
18              Whitney Miner (CA Bar No. 290825)
                wminer@kaollp.com
19              KAO LLP

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I herby certify that on August 17, 2018, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Whitney Miner*
Whitney Miner

PLAINTIFF GOVINO, LLC'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT